IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 13, 2011

## CHRISTA GODDARD v. THOMAS E. GODDARD

**Appeal from the Circuit Court for Hamilton County**
**No. 07D1512      W. Neil Thomas, III, Judge**

---

**No. E2011-00777-COA-R3-CV-FEBRUARY 24, 2012**

---

This is a post-divorce case. Thomas E. Goddard ("Father") appeals the trial court's order granting Christa Goddard ("Mother") permission to move to Florida with the parties' minor child, Emma Elizabeth (DOB: July 1, 2004)("the Child"). Based upon finding that Mother was spending the greater amount of time with the Child, the court applied Tenn. Code Ann. § 36-6-108(d)(1)(2010). The court found that the proposed relocation (1) had a reasonable purpose, (2) posed no threat of specific and serious harm to the Child, and (3) was not motivated by a vindictive effort to defeat Father's parenting rights. Father appeals. We affirm .

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Lisa Z. Bowman, Chattanooga, Tennessee, for the appellant, Thomas E. Goddard.

J. Christopher Clem, Chattanooga, Tennessee, for the appellee, Christa Goddard.

## OPINION

### I.

The parties were divorced in April 2009 following a twelve-year marriage. The agreed order of divorce incorporated the parties' *temporary* parenting plan addressing the custody and care of the Child who was nearly five at the time. The plan expressly provided that "[b]oth parties recognize that mother will be seeking permission to move at a later date";

the divorce judgment, however, stated that the parties had not reached an agreement "on the issue of whether [Mother] shall be allowed to move out of state." Accordingly, the matter was reserved for a future hearing.

The court-approved *permanent* parenting plan was adopted by it in August 2009. It largely mirrors the temporary plan. It did not expressly designate a primary residential parent, but it did provide that Mother was responsible for the day-to-day care of the Child except when the Child was with Father. Father was granted standard parenting time every other weekend from 7:00 a.m. Friday until 6:00 p.m. Sunday and overnight time with the Child every week from 3:00 p.m. Wednesday until 10:00 a.m. Thursday. Father was also allocated parenting time Monday through Thursday from 7:00 a.m. until 10:00 a.m. The summer parenting schedule provided that each of the parties was to receive two uninterrupted weeks with the Child. Holidays, school breaks, and special occasions were evenly divided between the parties. With respect to overall parenting time for the purpose of calculating child support, the days allocated to the parents were 255 for Mother and 110 for Father. Under the parenting plan, the figures were somewhat different, with Mother having the Child for 233 days and Father for 132.

In May 2010, Mother filed a petition to amend the parenting plan to allow her to move with the Child to Florida; she also sought increased child support. In June 2010, she filed a formal motion to relocate. Mother, a physical therapist, cited job opportunities, the proximity and support of her family, and a social network of friends available to her in Florida. In response, Father filed a petition in opposition to the relocation request and a counterclaim requesting that he be designated as the primary residential parent. In November 2010, Mother renewed her motion to relocate.

A three-day bench trial ensued. In addition to Father and Mother, the trial court heard from Father's new wife, Stephanie Goddard; the Child's paternal grandmother; the Child's maternal grandfather; Mother's aunt; Mother's supervisor; and others. The proof was to the effect that the parties had followed the parenting schedule as set forth in the permanent parenting plan. The limited instances of conflict regarding the parties' time with the Child centered largely around their differing interpretations of parenting time on holidays and other special dates, and the providing of care to the Child by anyone other than one of the parents. In this regard, Mother complained that she was, on occasion, unaware of the Child's whereabouts after Father, without informing Mother, picked up the Child from the babysitter. Similarly, Father recalled two occasions when Mother had refused to allow the Child's paternal grandmother to pick up the Child at school when he could not; Mother insisted that if she were available, it was her option to have that time with the Child. Mother indicated, however, that since the summer of 2010, there had been no further disagreements or incidents regarding parenting time. Mother stated her willingness to allow the Child to spend more

days with Father than as set forth in her newly proposed plan drafted in anticipation of her move. She suggested that, if more frequents visits or even relocation to Florida became an option for Father and Father's mother, they would be welcomed.

Mother explained that her proposed relocation was motivated by her desire to improve her financial circumstances; she believed that, with the assistance of her family, she could accomplish this by securing a better-paying job. Mother explained that she was in financial straits which she attributed primarily to a "tax scheme" that Father was involved in at his former place of employment involving tax evasion and fraud. In summary, the proof showed that Father left his job in January 2006 after the fertility clinic he managed was "raided" by the IRS. Subsequently, Father and Mother were left owing a substantial sum to the IRS as a result of unpaid taxes, penalties and interest. In addition, Father's former employer had secured a judgment against him as a result of Father's conversion of funds. Father had filed for bankruptcy protection. Mother returned to work to support the family after Father left his job. She estimated that, in the last four years, she had paid $40,000 to $50,000 on their behalf toward the IRS debt. Although Mother was deemed an "innocent spouse" in the filing of their joint tax returns, she remained liable for the tax obligation, exclusive of penalties and interest. As set forth in the divorce judgment, she was liable for a percentage of the taxes owed. Her income had been "seized" or garnished more than once. Asked at trial whether she was moving because of friction with Father, Mother testified, "No. Financially, I'm not going to make it here."

In addition to the other hardships created by the tax debt, Mother had encountered problems trying to refinance the former marital home which had been awarded to her in the divorce. She testified that there was a "balloon payment" of $120,000 due in August 2010, which had not been paid and stated that she had received a letter from her bank advising that it intended to begin foreclosure proceedings. Mother said she had voluntarily paid thousands of dollars to the IRS trying to remove multiple liens, but still had not been able to refinance her home. She testified that, as a result of the time and effort she was spending trying to save her home and get her finances in order, she felt she had no choice but to reduce her case load at work, thereby lowering her anticipated income. For his part, Father had ceased working full-time in 2006, well before the divorce. At the time of trial, Father had remarried and was earning some $24,000 annually as a part-time contract employee at Southern Adventist University. He had obtained his master's degree and was pursuing increased responsibilities and pay at work.

Friends, family, and acquaintances of the parties testified to each party's relationship with the Child. Mother was described as a "wonderful" parent who was always careful not to discuss anything related to Father in the Child's presence. Father was described as doing a good job of balancing proper parenting and discipline with letting the Child know how

-3-

special she was to him; one close friend of Father's stated it would be "devastating" to Father if the Child moved away. The paternal grandmother testified that, although they had shared a good relationship in the past, Mother had grown "cold" toward her after the divorce and that Mother now considered her nothing more than one of the Child's babysitters. With respect to her immediate family, Mother's own mother had died when Mother was a child. Mother conceded that she and her father had differences that resulted in a lack of communication for some six years – during most of the time that she and Father were married. Mother and her father agreed that they had repaired their relationship. They planned to work together to get Mother in a better financial position. To this end, her father had given Mother prospective job contacts, offered her the use of a vehicle, and had opened his home to her and the Child during their transition to a new home.

The trial court found that the parties were not spending "substantially equal" intervals of time with the Child; accordingly, it applied Tenn. Code Ann. § 36-6-108(d)(1) to the relocation request. The court concluded that Mother was entitled to relocate with the Child upon concluding that (1) "[M]other's financial condition, employment situation, family support and desire to relocate to Florida" constituted a reasonable purpose for the move; (2) the move did not pose a threat of specific and serious harm to the Child; and (3) the move was not motivated by a desire on Mother's part to impinge upon Father's parenting time.

After granting Mother's motion to relocate, the court entered a modified permanent parenting plan and denied Mother's petition for a wage assignment and increased child support, without prejudice, in order to allow Father more time to obtain a better-paying job. Father timely filed a notice of appeal.

II.

Father presents the following issues for our review:

> 1. The trial court erred in its application of Tenn. Code Ann. § 36-6-108(d)(1) to grant Mother permission to relocate with the parties' minor child.
>
> 2. The trial court erred in allowing Mother to move with the minor child to the state of Florida prior to the order becoming final and resolution of this appeal.

As an additional issue, Mother submits that she is entitled to an award of her reasonable attorney's fees and costs incurred in defending this appeal.

-4-

III.

In this non-jury case, our standard of review is de novo upon the record of the proceedings below; however, the record comes to us with a presumption of correctness as to the trial court's factual determinations, a presumption we must honor unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995). Because "custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility . . . appellate courts are reluctant to second-guess a trial court's decisions." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Our review of questions of law is de novo with no presumption of correctness attaching to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

IV.

A.

In granting Mother permission to relocate, the trial court made the following pertinent findings:

> [P]ursuant to T.C.A. Section 36-6-108(d)(1), the parties were not spending substantially equal intervals of time with the child, and . . . [M]other was spending the greater amount of time.
>
> [M]other's financial condition, employment situation, family support and desire to relocate to Florida constitute[ ] a reasonable purpose pursuant to T.C.A. Section 36-6-108(d)(1)(A).
>
> [M]other's relocation to Florida would not pose a threat of specific and serious harm to the child pursuant to T.C.A. Section 36-6-108(d)(1)(B).
>
> [M]other's motive was not vindictive and was not intended to defeat [F]ather's parenting time pursuant to T.C.A. Section 36-6-108(d)(1)(C).
>
> Accordingly, considering the above findings of fact this Court finds that T.C.A. Section 36-6-108 is applicable to the current case, and that [M]other is entitled to relocate to Florida.

Father seems to suggest that the trial court erred when it determined that subsection (d)(1) of Tenn. Code Ann. § 36-6-108 is the appropriate law in this case. We will now examine that statute, the trial court's findings with respect to the facts when viewed in the context of the statute, and the various arguments of the parties.

B.

Parental relocation cases are governed by the provisions of Tenn. Code Ann. 36-6-108. The statute provides, in relevant part, as follows:

> (a) If a parent who is spending intervals of time with a child desires to relocate outside the state or more than one hundred (100) miles from the other parent within the state, the relocating parent shall send a notice to the other parent . . . .

> (b) Unless the parents can agree on a new visitation schedule, the relocating parent shall file a petition seeking to alter visitation. The court shall consider all relevant factors, including those factors enumerated within subsection (d). The court shall also consider the availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent. The court shall assess the costs of transporting the child for visitation and determine whether a deviation from the child support guidelines should be considered in light of all factors including, but not limited to, additional costs incurred for transporting the child for visitation.

> (c) If the parents are actually spending substantially equal intervals of time with the child and the relocating parent seeks to move with the child, the other parent may, within thirty (30) days of receipt of notice, file a petition in opposition to removal of the child. No presumption in favor of or against the request to relocate with the child shall arise. The court shall determine whether or not to permit relocation of the child based upon the best interests of the child. The court shall consider all relevant factors . . . .

* * *

(d)(1) If the parents are not actually spending substantially equal intervals of time with the child and the parent spending the greater amount of time with the child proposes to relocate with the child, the other parent may, within thirty (30) days of receipt of the notice, file a petition in opposition to removal of the child. The other parent may not attempt to relocate with the child unless expressly authorized to do so by the court pursuant to a change of custody or primary custodial responsibility. The parent spending the greater amount of time with the child shall be permitted to relocate with the child unless the court finds:

(A) The relocation does not have a reasonable purpose;

(B) The relocation would pose a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody; or

(C) The parent's motive for relocating with the child is vindictive in that it is intended to defeat or deter visitation rights of the non-custodial parent or the parent spending less time with the child.

\* \* \*

(e) If the court finds one (1) or more of the grounds designated in subsection (d), the court shall determine whether or not to permit relocation of the child based on the best interest of the child. If the court finds it is not in the best interests of the child to relocate as defined herein, but the parent with whom the child resides the majority of the time elects to relocate, the court shall make a custody determination and shall consider all relevant factors. . . .

Recently, this Court reiterated the purpose and application of Section 36-6-108 as follows:

In 1998, our state legislature enacted Tennessee Code Annotated section 36-6-108, which applies when a parent seeks to relocate outside the state or more than 100 miles away from the other

parent residing within the state. The statute was enacted to provide consistency in relocation proceedings.

\* \* \*

Under the statute, the appropriate standard to be applied when the other parent does file a petition in opposition to removal of the child depends upon whether the parents actually spend substantially equal amounts of time with the child. Thus, the trial court must first decide whether the parents are "actually spending substantially equal intervals of time with the child." Tenn. Code Ann. § 36-6-108(c), (d). If they do, no presumption in favor of or against relocation arises, and the court decides the petition to relocate on the basis of the child's best interest. Tenn. Code Ann. § 36-6-108(c). "The approach differs if the parents are 'not actually spending substantially equal intervals of time with the child.' " The statute "reflects a legislatively mandated presumption in favor of relocating custodial parents who spend 'the greater amount of time with the child.' " If the parent who seeks to relocate with the child spends the greater amount of time with the child, the court "shall" permit the relocation unless the other parent can establish that the relocation: 1) does not have a reasonable purpose; 2) poses a threat of specific and serious harm to the child that outweighs the threat of harm from a change of custody; or 3) is due to a vindictive motive in that it is intended to defeat or deter visitation rights of the other parent. Tenn. Code Ann. § 36-6-108(d). The parent opposing the relocation bears the burden of proof to establish one of these three grounds, and if he or she fails to do so, the relocation shall be permitted. If one of these three circumstances is shown, the court then proceeds to a best interest analysis. Tenn. Code Ann. § 36-6-108(e).

*Lima v. Lima*, No. W2010-02027-COA-R3-CV, 2011 WL 3445961 at \* 3 (Tenn. Ct. App. W.S., filed Aug. 9, 2011)(internal citations omitted).

C.

First, without directly asserting that the trial court erred in applying Tenn. Code Ann. § 36-6-108(d)(1), Father urges us to apply subsection (c) – governing situations in which the

-8-

parents *are* spending "substantially equal intervals of the time with the child." He reasons that "the fact that he was seeing his daughter 11 out of every 14 days, while not for the same number of hours, does equate to a 'substantially equal' amount of time. . . ."

The Supreme Court has observed that "section 36-6-108 does not define what constitutes 'actually spending substantially equal intervals of time.' " ***Kawatra v. Kawatra***, 182 S.W.3d 800, 803 (Tenn. 2005). The High Court has concluded, however, that

> the use of hours as the sole basis for computing the time that each parent spent with the child does not provide the trial court with the flexibility needed to consider the circumstances of each case. Rather, the "time actually spent" with each parent should be computed in units of a day.

***Id***.; *see also* Tenn. Comp. R. & Regs. 1240-2-4-.02(10) (2005) (adopting a definition of "day" under the Child Support Guidelines). Further,

> [t]o allocate a day to one parent when both parents claim credit for that day, the trial court should examine 1) the hours each parent actually spent with the child on that day; 2) the activities in which each parent engaged with the child; 3) the resources the parent expended on the child's behalf during that time period, including the costs of a meal or any other costs directly related to that parent's care and supervision of the child; and 4) any other factor that the trial court deems relevant.

***Id***. at 804.

Father offers no support for his assertion that his seeing or having contact with the Child on most days, regardless of the time involved, somehow automatically equates to equal parenting time with that credited to Mother. In any event, we must reject Father's argument. As this Court has observed, "the question is not how often a parent 'sees' a child, but rather the number of days a child is in the custody of a parent." ***Roberts v. Roberts***, No. E2005-01175-COA-R3-CV, 2005 WL 2860199 at *5 (Tenn. Ct. App. E.S., filed Oct. 31, 2005). In the present case, the proof at trial showed that, under any relevant measure of time, whether it be the "days" used to calculate child support, the residential schedule set out in the parenting plan, or the calculation of the time each parent actually spent with the Child over a period of some seven months before trial, there is no question but that Mother spent the greater amount of time with the Child. At best, Mother's calculation of the hours that each parent actually spent with the Child – in the seven-month period from the filing of the

petition to relocate until the trial – showed that the Child was with Mother 65.3% of the time and with Father the remaining 34.7%. At trial, Father did not dispute the accuracy of Mother's calculations or offer any proof to the contrary.

In summary, the evidence overwhelmingly supports the application of Tenn. Code Ann. Sec. 36-6-108(d)(1) as the proof shows that these parents were not spending "substantially equal intervals of time" with the Child. In reaching this conclusion, we do not mean to suggest that the time Father spends with the Child is not substantial, only that it is not "substantially equal" under the applicable statutory provision. *Id*. (citing *Collins v. Coode*, No. M2002-02557-COA-R3-CV, 2004 WL 904097 at *3 (Tenn. Ct. App. M.S., filed Apr. 27, 2004) (stating that the "plain meaning of the term 'substantially equal' connotes a relationship that is very close to equality – so close that it may be considered equal.")).

Having determined that the trial court properly applied subsection (d)(1), we turn now to consider the trial court's additional findings – that Mother's relocation had a reasonable purpose, that relocation would not result in specific and serious harm to the child, and that Mother's motive for relocating was not vindictive. *See* Tenn. Code Ann. § 36-6-108(d)(1)(A)-(C).

## D.

### 1.

At trial, Mother testified to the reasons for her proposed relocation:

> Financially, I can't do it financially. And the amount of time that I'm having to spend working on issues with the IRS is increasing and increasing, and my house is going into foreclosure. My car is about to die. . . . This January it's going to be 20 years old. The family that I have here cannot give me the support I need. The people that I interact with here, they have their own lives.
>
> If I was able to move down to Florida, . . . my dad could loan me a car . . . until I can get things worked out, and, . . . they have a higher pay there. It's a no garnish state. You know, I don't have to worry about the IRS garnishing my wages. I can actually get back on my feet.

\* \* \*

And I have four job opportunities, viable job opportunities in
Florida that make more money.

Mother named the four health care entities with whom she felt she had "viable job
prospects." She testified that she had had "multiple interviews and multiple interviews with
the same person like second and third interviews with employers, and they've stated that if
I am allowed to move, that they are interested in hiring me." Mother noted that all four
options would provide her better pay but still afford her a flexible schedule. Mother
estimated that, as a physical therapist, she could earn up to $10 more per patient in the
Florida market which would make a "significant" difference in her income. She also
planned to accept assistance from her father and his wife regarding housing, transportation,
and some child care during her transition. Mother had checked into schooling for the Child.
She planned for her daughter to attend the same private, church-based elementary school that
Mother herself had attended as a child.

Father argues that Mother's financial condition and employment situation, in
particular, do not provide a "reasonable purpose" for her planned move. He points to the fact
that, at trial, Mother had no firm Florida job offer in hand. He likens Mother's situation to
that presented in *Butler v. Butler*, No. M2002-00347-COA-R3-CV, 2003 WL367241 (Tenn.
Ct. App. M.S., filed Feb. 20, 2003). In that case, this Court observed a "fundamental
problem [with] the lack of proof concerning any job in Texas" and further noted that

> [m]other offers no proof of anything in Texas except a belief
> and a hope that she can secure better employment. There is no
> proof in the record that [she] has any friends or acquaintances in
> the Dallas-Ft. Worth area.

*Id*. at *4. The *Butler* Court affirmed the trial court's denial of the motion to relocate on the
basis that the move had no reasonable purpose.

Returning to the present case, the trial court relied instead on *Caudill v. Foley*, 21
S.W.3d 203, 212 (Tenn. Ct. App. 1999). *In Caudill*, we concluded that, as distinguished
from *Butler*, the mother's purported reasons for relocating, including her "excellent chance
for re-employment" with her former employer in Florida, constituted a reasonable purpose
for her relocation. In the present case, the trial court similarly found that "the possibility of
better employment, a possibility of perhaps putting certain financial matters behind her does
constitute a reasonable purpose for moving. . . ." On our review of the record, the evidence
does not preponderate against the trial court's finding that Mother's "financial condition,

employment situation, family support and desire to relocate to Florida constitute[ ] a reasonable purpose" for the move.

2.

Next, the trial court found that the relocation did not pose "a threat of specific and serious harm to the child that outweighs the threat of harm to the child of a change of custody." Tenn. Code Ann. § 36-6-108(d)(1)(B). With respect to this ground, the statute further provides that "specific and serious harm to the child" includes, but is not limited to the following:

> (A) If a parent wishes to take a child with a serious medical problem to an area where no adequate treatment is readily available;
> (B) If a parent wishes to take a child with specific educational requirements to an area with no acceptable education facilities;
> (C) If a parent wishes to relocate and take up residence with a person with a history of child or domestic abuse or who is currently abusing alcohol or other drugs;
> (D) If the child relies on the parent not relocating who provides emotional support, nurturing and development such that removal would result in severe emotional detriment to the child;
> (E) If the custodial parent is emotionally disturbed or dependent such that the custodial parent is not capable of adequately parenting the child in the absence of support systems currently in place in this state, and such support system is not available at the proposed relocation site; or
> (F) If the proposed relocation is to a foreign country whose public policy does not normally enforce the visitation rights of non-custodial parents, that does not have an adequately functioning legal system or that otherwise presents a substantial risk of specific and serious harm to the child.

Tenn. Code Ann. § 36-6-108(d)(2)(A)-(F).

Of the listed instances of "specific and serious harm," Father essentially concedes that none, with the possible exception of subpart (D), exist in this case. Referring to subpart (D), Father implicitly suggests that, because of the Child's relationship with him, she would suffer serious emotional harm if forced to move to Florida. As we understand his argument, Father contends that it would be in the Child's best interest, and less "harmful" and disruptive to the

-12-

Child, to remain in Tennessee with Father serving as the primary residential parent, rather than to relocate to Florida with Mother. In its bench ruling, the trial court addressed Father's position:

> Subsection [(d)(1)(B)] . . . provides that the relocation may take place unless there is harm to the child. If I were to approach this case on a best interest of the child, that is[,] best interest of Emma, I would have to approach it differently. I am not placed with the best interest of the child. The best interest of the child appl[ies] only when the parents are spending substantially equal time with the child. It's that provision which kicks in the best interest. So to find harm to the child, I would have to have some sort of medical or other serious proof of physical or mental harm to the child, and in this case, I can't make that finding.

In challenging the trial court's finding, Father insists that the court erred in failing to consider Mother's relocation solely in the context of the best interest of the child. To the extent Father's argument suggests that the parental relocation statute fails to incorporate considerations of a child's best interest, we must disagree. As we said in *Caudill,* 21 S.W.3d at 211-12, n.3

> [t]he best interests of the child are fundamentally interrelated with the best interests of the custodial parent. *See Aaby*, 924 S.W.2d at 627 (citing *Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993)). Similarly, we think that the best interests of the child are also fundamentally interrelated with the best interests of the parent with whom the child spends the majority of his or her time.

Hence, the reason for the "legislatively mandated presumption in favor of relocating custodial parents who spend 'the greater amount of time with the child.' " *Elder v. Elder*, No. M1998-00935-COA-R3-CV, 2001 WL 1077961 at *5 (Tenn. Ct. App. M.S., filed Sept. 14, 2001).

Returning to the relocation statute, Tenn Code Ann. 36-6-108(e) provides that "*[i]f* the court finds one (1) or more of the grounds designated in subsection (d), the court shall determine whether or not to permit relocation of the child based on the best interest of the child." (Emphasis added). As can be seen, the statute does not direct the trial court to undertake a separate, best-interest-of-the-child analysis unless and until one of the grounds in subsection (d) is proven. In this case, the evidence does not preponderate against the trial

court's finding that the move poses no "specific and serious" threat of harm to the Child as contemplated by Section 36-6-108(d)(1)(B).

3.

The trial court found that Mother did not have a vindictive motive for moving. Father points to the fact that, under the new residential schedule Mother has proposed, his "day to day" parenting time is eliminated and the schedule was otherwise modified to account for the Child residing out of state. At trial, Mother testified that she was willing for Father (and paternal grandmother) to have still more days during the summer and other school breaks and any other times that they could travel to Florida. Father, however, asserts that the changes to the parenting schedule in and of themselves evidence a vindictive motive on Mother's part to decrease his time with the Child. On this issue, the trial court found:

> We finally get to subsection [(d)(1)(C)], which I think, and as I indicated to you before, is the heart of this case, and that is whether the motive of the mother is vindictive to defeat or deter the visitation rights of the father. . . . Here the mother has made an offer of substantial time.
>
> Now, I will say, I will concede that it is not the same amount of time that the father is spending with Emma here, but . . . any relocation is going to involve a disruption of a residential schedule. . . . [A]lthough there . . . have been disputes between the parties concerning residential time and whether the residential time with one party has been interrupted by the conduct or action of the other, I do not find that to rise to the level of vindictiveness to defeat or deter the visitation rights of the other parent.
>
> Consequently, I believe that the request for relocation is well taken and I will grant that petition. I also want the father to have substantial time with Emma as offered by the mother, and by that I mean at least seven weeks during the summer, spring break, fall break, equal time at Christmas. . . .
>
> Also, any amount of time on reasonable notice that either [Father] or [paternal grandmother] or [Father's] present wife want to spend with Emma in Florida, just give her notice that that's going to happen and that will happen. So I'm trying to

-14-

accommodate the father as well as consider the requirements
that I am required to consider under the statute.

As the trial court observed, it is practically impossible for a parent to relocate out of state with no discernable changes to the other parent's scheduled time with the child. In this case, however, the court found that Mother was not motivated by vindictiveness, but, rather, was acting reasonably, and that her offer for Father to spend more, extended periods of time with the Child during school breaks was sincere. As the Supreme Court has held,

> [a] move in any child's life, whether he or she is raised in the context of a one or two parent home, carries with it the potential of disruption; such common phenomena – both the fact of moving and the accompanying distress – cannot constitute a basis for the drastic measure of a change of custody.

*Aaby*, 924 S.W.2d at 630. Again, the evidence does not preponderate against the trial court's finding that Mother's motive in wanting to relocate to Florida was not vindictive.

On our considered review of the evidence, we conclude that Tenn. Code Ann. § 36-6-108(d)(1) governs this case and that Father failed to meet his burden of establishing the existence of any of the designated bases for denying Mother's relocation request pursuant to Section 36-6-108(d)(1) (A)-(C). The trial court did not err in its application of the parental relocation statute and the evidence does not preponderate against its findings in support of its judgment to allow Mother's request to relocate to Florida with the Child.

V.

Father challenges the trial court's decision to allow the Child's removal to Florida pending entry of the final judgment and resolution of the instant appeal. To review, the court issued its bench ruling permitting Mother's relocation on January 13, 2011. At the conclusion of the hearing, the court and counsel discussed the effect of the ruling. Asked whether there would be "any limitations on when [Mother] can relocate," the court advised that if an appeal was filed, it would hear a motion to stay at that time. The court further advised that under the Rules of Civil Procedure, its decision would not become effective "until 30 days from the expiration of the date of the final decree."

Father complains that "only 29 days" after the court announced its ruling on January 13, 2011, the court allowed Mother to relocate, which was well before the expiration of his

-15-

time for filing an appeal from the March 4, written order.[1] *See* Tenn. R. App. P. 4 (providing that an appeal as of right shall be filed "within 30 days after the date of entry of the judgment appealed from . . . ."). Mother counters that after the court announced its bench ruling in January, Father refused to agree to the terms of the final order until March 4, which led her to seek post-judgment relief. The March 4, 2011, final order reflects that a post-judgment hearing was held on February 14, 2011, at which time the court ruled from the bench that as of that hearing date, "[Mother] may move to Florida pending the resolution of post judgment issues and pending any possible appeal."

Tennessee Rule of Civil Procedure 62 governs the stay of proceedings to enforce a judgment pending appeal. Rule 62.01 provides, in relevant part, as follows:

> Except as otherwise provided in this rule, no execution shall issue upon a judgment, nor shall proceedings be taken for its enforcement until the expiration of 30 days after its entry. *In . . . actions . . . that award, change or otherwise affect the custody of a minor child, an interlocutory or final judgment shall not be stayed after entry unless otherwise ordered by the court* and upon such terms as to bond or otherwise as it deems proper to secure the other party.

(Emphasis added). Rule 62.03, regarding relief pending appeal, further provides that "[w]hen an appeal is taken from an interlocutory or final judgment in actions specified in Rule 62.01 . . . , the court in its discretion may suspend relief or grant whatever additional or modified relief is deemed appropriate during the pendency of the appeal . . . ." Lastly, Rule 62.04 provides that "[e]xcept as otherwise provided in Rule 62.01, when an appeal is taken the appellant by giving a bond may obtain a stay."

Rule 62.01 thus expressly excepts the present action pertaining to custody of the Child from its automatic stay provisions. The record does not reflect when Mother and the Child actually left Tennessee for Florida, and Father's only assertion on this subject is that the Child was moved "prior to the end of the 2011 school year." Again, the court's final order was filed on March 4, and Father timely filed an appeal later that month. Pursuant to Rule 62.03, it was within the trial court's discretion to grant Mother post-judgment relief and permit her to relocate during the pendency of the appeal.

---

[1]The record reflects that Father filed a notice of appeal on March 31, 2011.

## VI.

Finally, we consider Mother's request for an award of her attorney's fees and expenses on appeal. The decision whether to award attorney's fees incurred on appeal is a matter within the discretion of this Court. *See Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995); *see also* Tenn. Code Ann. § 36-5-103(c). In our discretion, we deny Mother's request for an award of attorney's fees and expenses for appellate work.

## VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Thomas E. Goddard. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE